UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICKY McGEE,
    Plaintiff,

     v.                                                                         CIVIL ACTION NO. 14-13765-MPK

CAROL HIGGINS O'BRIEN and
SEAN MEDEIROS, in their official capacities,
COMMONWEALTH OF MASSACHUSETTS,
    Defendants.

MEMORANDUM AND ORDER ON
MOTION FOR SUMMARY JUDGMENT (#25), DEFENDANTS' OPPOSITION
TO AND CROSS-MOTION FOR SUMMARY JUDGMENT (#30) AND
PLAINTIFF'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT (#36).

KELLEY, U.S.M.J.

I. Introduction.

On October 2, 2014, plaintiff Ricky McGee filed a five-count complaint seeking declaratory and injunctive relief under 42 U.S.C. § 1983, the First and Fourteenth Amendments of the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), and the Constitution of the Commonwealth of Massachusetts. Plaintiff and Defendants, Carol Higgins O'Brien and Sean Medeiros, in their official capacities,[1] and the Commonwealth of Massachusetts, filed cross-motions for summary judgment (##25, 34) in July and August, 2015, respectively. Plaintiff filed a supplemental motion for summary judgment in

---

[1] Carol Higgins O'Brien, now the Commissioner of the Department of Correction, was not employed in that capacity during the time at issue. Similarly, Sean Medeiros, presently the Superintendent of MCI-Norfolk, did not hold that position during the relevant time period. (#31, Statement of Material Facts ¶ 1.)

1

which he narrowed his complaint to only his RLUIPA claims. (#36.) Defendants filed an opposition to Plaintiff's supplemental motion for summary judgment on September 23, 2015. (#39.)

Plaintiff is serving a life sentence and is now housed at the Massachusetts Correctional Institute at Concord ("MCI-Concord") where he actively practices the faith of the Nation of Gods and Earths ("NGE"). He alleges claims under RLUIPA for constraints on his ability to practice NGE while previously incarcerated at the Massachusetts Correctional Institute at Norfolk ("MCI-Norfolk").

## II. The Facts.

The parties agree that there is no dispute over the material facts in this case. NGE was founded in 1964 by a student of Malcolm X and a former member of the Nation of Islam, and has grown from an offshoot of the Nation of Islam to gain legal recognition as a separate religion. Adherents of NGE are required to help educate others, or proselytize, and are expected to study and adhere to the religion's central literature: The 120 Degrees, The Supreme Alphabet, The Supreme Mathematics, and The Five Percenter.

NGE is one of seventeen religious groups recognized by the Massachusetts Department of Corrections ("DOC") in its Religious Services Handbook (the "Handbook"). (#35-1, Affidavit of Christopher Mitchell[2] ¶ 2.) The Handbook, first published in 1999, is the culmination of many years of work "wherein the Department of Correction's chaplains, administrators, outside religious groups and the Department's legal division collaborated to craft religious accommodation policies that are consistent with the health, safety, security and fiscal constraints of the Department." (#35-1 ¶ 4.)

---

[2] Christopher Mitchell is the Director of Reentry and Program Services for the DOC, having been appointed to the position in 2007. (#35-1 ¶ 1.) Mr. Mitchell has been employed by the DOC in various positions since 1987. *Id.*

The Handbook is described as "a dynamic resource tool" that is revised frequently in response to inmate religious requests and feedback from DOC chaplains and religious volunteers. (#35-1 ¶ 6.)

NGE was added to the Handbook in January, 2007, following a settlement between the DOC and an inmate who adhered to NGE. (#35-1 ¶ 7.) In developing an NGE section for the Handbook, the DOC worked closely with Mr. Born King Allah, also known as Donald Palmer, who serves as the nationwide Prison Administrator for NGE. (#35-1 ¶ 8.) In the process of recognizing NGE, the Religious Services Review Committee[3] ("RSRC") read and reviewed the Supreme Alphabet, the Supreme Mathematics and the 120 Degrees, NGE's central literature. (#35-1 ¶ 10.) After receiving input and feedback from Mr. Palmer and the DOC's Central Intelligence Unit, and guided by the December 2005 Ellis Settlement Agreement,[4] the RSRC determined there were security concerns associated with the contents of some of the materials, as some could be interpreted as advocating violence or murder.[5]  *Id.*  According to Mr. Mitchell, a member of the RSRC, "[o]ur concern as a Committee was that inmates, processing this material by themselves, out of context, might be incited

---

[3] At the relevant time, the members of the RSRC included two Assistant Deputy Commissioners, each of whom had decades of experience in the DOC including serving as Superintendents at various DOC facilities, a Deputy Commissioner of Classification, Reentry and Programs and the Director of Reentry and Program Services. (#35-1 ¶¶ 29-30.) In light of their experience, these individuals had considerable security expertise. *Id.*

[4] This refers to the Settlement Agreement reached in another case brought by an inmate NGE adherent.

[5] For example, in the literature, the "original man" is defined as "the Asiatic Blackman, the maker, the owner, the cream of the planet earth, father of civilization and God of the Universe." (#35-5 at 1.)  The "colored man" is defined as "the Caucasian (white man) or yacob's grafted devil, the white man of the planet earth." *Id.*  In one lesson, it is taught that "the Earth belongs to the Original man and knowing that the devil is weak and wicked and there wouldn't be any peace among them." (#35-5 at 3.) In response to the question "[w]hy does Muhammed and any muslim murder the devil?," it is taught that it is "[b]ecause the devil is 100% weak and wicked and will not obey the laws of Islam . . . . So Muhammed learned that he could not reform the devil and so they had to be murdered. . . ." (#35-5 at 6.)

to violence against other inmates and staff." *Id.*  Consequently, restrictions were placed on NGE members, which included limiting their study of NGE's literature and worship to within their own cells.  *Id.*  NGE's literature and written materials were only for the personal use of the NGE adherent. *Id.*

Since the addition of the NGE section to the Handbook, two changes have been made at the request of Mr. Palmer. (#35-1 ¶ 11.)  Mr. Palmer objected to the use of the term "Holy Days" because "where a male practitioner views himself as a God, there is no need for a Holy Day, insofar as a God doesn't worship himself." (#35-1 ¶ 12.)  A compromise was reached, and the days were redesignated as "Honor/Holy Days/Festivals." *Id.*  Second, Mr. Palmer sought removal of the phrase "Security Threat Group" from the NGE section of the Handbook, and this was done in January 2011. (#35-1 ¶ 13.)  Other changes include that NGE adherents may now receive Halal meals if requested (*compare* #35-3 at 3 with 35-3 at 7) and possession of a Universal Flag medallion has been approved by the RSRC and the Commissioner of the DOC. (*Compare* #35-3 at 7-8 with 35-3 at 11.)

NGE does not have a full-time chaplain on staff in the DOC due to limited resources. (#35-1 ¶ 40.)  The DOC does not have the budget to hire a NGE chaplain: the "creation of a new DOC Chaplain position requires the involvement of outside stakeholders, which includes the Commonwealth's Human Resources division.  Currently, there is a statewide hiring freeze in the Commonwealth." (#35-1 ¶ 40.) Instead, the DOC relies on volunteers for religious services. (#31-1 ¶¶ 34-40.)  This is not uncommon, as only ninety-two inmates across the seventeen DOC facilities – thirty-one of whom are at MCI-Norfolk – adhere to NGE. (#31-1 ¶¶ 43-44.)  Other religious groups, including Native Americans (twenty-seven inmates practicing) and Buddhists

4

(thirty-eight inmates), do not have their own chaplain. (#31-1 ¶ 44.) NGE practitioners are welcomed to worship with Minister Randy Curet of the Nation of Islam, the religion from which NGE originated. (#31-1 ¶¶ 34-36.) Many NGE members attend the weekly Nation of Islam corporate worship. (#31-1 ¶ 36.)

The Handbook provides that "'if requested, inmates who identify themselves as NGE adherents should be allowed to corporately celebrate the four holy days mentioned above . . . with the presence of an external approved NGE permanent volunteer. Also, one-on-one meetings between inmate adherents and external approved NGE volunteers in accordance with 103 CMR 471.10 will be allowed if consistent with institutional safety and security requirements.'" (#35-1 ¶ 19.) Mr. Mitchell states that he has worked with Mr. Palmer to recruit religious volunteers pursuant to the Volunteer Services Policy to lead NGE corporate services, as has William Milhomme, the DOC Director of Volunteer Services. (#35-1 ¶¶ 14, 37.) As a result of their efforts, more NGE volunteers have been recruited to provide religious education and spiritual counseling to NGE inmates. (#35-1 ¶ 37.) Difficulties remain in retaining volunteers for a variety of reasons, i.e., some NGE volunteers are inappropriate due to prior relationships with NGE inmates, time commitments involved pose hurdles when volunteers work full time, and individuals with prior records would not qualify. (#35-1 ¶ 38.) At present one NGE volunteer, John Cox, goes to MCI-Norfolk to provide NGE religious education, study and corporate worship services. *Id.* Because Mr. Cox lives in western Massachusetts, on occasion he is unable to visit MCI-Norfolk. *Id.*

The DOC has a policy that prohibits inmate preaching or proselytizing entitled Inmate Management, 103 DOC at 400.06, No Inmates Control Over Other Inmates(s), which provides

"No inmate or group of inmates shall be in a position of control or authority over any other incarcerated person(s)." (#35-1 at ¶ 46.)  According to Mr. Mitchell, this policy "serves the Department's compelling security need to supervise 10,500 inmates in its 17 prison facilities." *Id.*

Plaintiff's grievances with MCI-Norfolk began on or about April 16, 2010, when he alleges that he and twelve other NGE practitioners were told to disperse while assembled in the prison's recreational area. (#1 ¶ 32.)  On April 24, 2010, Plaintiff filed a grievance with the prison seeking a space to study with other members of NGE; the grievance was denied and appealed to Superintendent Gary Roden. (#1 ¶¶ 33-35.)  The appeal upheld the denial of Plaintiff's grievance and stated that members of NGE were not allowed to have one-on-one meetings with other members except when supervised by an approved NGE volunteer. (#1 ¶ 35.)

The RSRC is responsible for reviewing all inmate religious requests and then making a formal recommendation to the Commissioner of the DOC. (#35-1 ¶ 31.)  In May 2010, Plaintiff requested access to corporate worship, fasting, reflections upon NGE literature, group gatherings, and designated space for NGE members to worship and collectively study the religion's central literature through an Inmate Religious Services Review Request Form. (#1 ¶ 36.)  In November 2010 Plaintiff received a response from the RSRC wherein most of his May 2010 requests were deferred to the Program Services Division. (#1 ¶ 43.)  When no action had been taken by the Program Services Division, on March 6, 2013, Plaintiff filed a grievance to address the denial of his ability to discuss his religion with other NGE adherents with no volunteer present. (#1 ¶ 46.)  This grievance was denied and Plaintiff was advised that he had the right to file an Inmate Religious Services Request Form to the Director of Treatment's Office. (#1 ¶ 47.)  Plaintiff appealed, but the appeal was denied. (#1 ¶ 48.)  Plaintiff then met with the Acting Director of

Treatment in July 2013, who told him "that she follows instructions on this issue from the Program Services Division and uses the Religious Service handbook as her central guide when dealing with NGE practices, and that she could not deviate from these references." (#1 ¶ 49.)

Plaintiff claims that his rights under RLUIPA have been abridged, and seeks an order for five forms of relief: "(1) permit NGE adherents to participate in group observance of NGE Honor Days, Civilization classes, Rallies, and Parliaments; (2) provide an area to hold the above-mentioned meetings, to engage in corporate worship, and to study and worship collectively, where NGE adherents can bring their lessons and materials, including the 120 Degrees, the Supreme Alphabet, and the Supreme Mathematics; (3) allow NGE members to have one-on-one conversations about their cultural tenets without the presence of an approved volunteer; (4) relieve NGE adherents of the stigma of having ties to an all-edged Security Threat Group in the D.O.C.'s Religious Service Manual; and (5) permit NGE adherents to invite unrecognized members of NGE to attend any of the four cultural observances throughout the year." (#1 ¶ 58.)  Defendants argue that there has been no violation of Plaintiff's rights under RLUIPA and that they are entitled to the entry of judgment as a matter of law.

### III. Summary Judgment Standard.

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Tobin v. Federal Express Corp.*, 775 F.3d 448, 450 (1st Cir. 2014) (internal quotations marks and citation omitted). The applicable rule mandates that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment would be inappropriate "if the record

is sufficiently open-ended to permit a rational fact finder to resolve a material factual dispute in favor of either side." *Pierce v. Cotuit Fire District*, 741 F.3d 295, 301 (1st Cir. 2014).

The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). A genuine issue of fact exists where a fact finder could find in favor of the non-moving party, "while material facts are those whose existence or nonexistence has the potential to change the outcome of the suit." *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (internal quotations marks and citation omitted). "Once the moving party avers the absence of genuine issues of material fact, the non-movant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal quotation marks and citation omitted).

In determining whether summary judgment is proper, evidence is considered "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor. *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (further

internal quotation marks omitted)).

### IV. RLUIPA Standard.

RLUIPA was enacted[6] in response to the Supreme Court's decision in *City of Boerne v. Flores*, 521 U.S. 507, 529–36 (1997), which struck down portions of the Religious Freedom Restoration Act. *Spratt v. Rhode Island Dept. of Corrs.*, 482 F.3d 33, 37 (1st Cir. 2007). "RLUIPA ... protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005) (footnote omitted).

In relevant part, RLUIPA provides that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in [42 U.S.C. § 1997], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

   (1) is in furtherance of a compelling governmental interest; and

   (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). When interpreting the requirements of the RLUIPA, the First Circuit Court of Appeals established a four-part test for a successful challenge under the Act. *Spratt,* 482 F.3d at 38. The burden is on the plaintiff to establish the initial two elements: (1) that an institutionalized individual's religious exercise has been burdened; and (2) that burden was substantial. *Id.* If that two-part inquiry is satisfied, the burden then shifts to the government to demonstrate: (3) the burden furthers a compelling governmental interest; and (4) the burden is the

---

[6] RLUIPA narrowed the statute protecting religious freedom to apply only to programs in institutions that receive federal financial assistance.

least restrictive means of furthering that interest. *Id.* When applying the burden-shifting standard established by the statute, courts should afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723 (internal citation, quotation marks and footnote omitted).

What constitutes a "substantial burden" under RLUIPA was not defined in the Act. It is deemed a term of art that has been considered by the Supreme Court in various contexts. *See Sherbert v. Verner*, 374 U.S. 398, 404 n. 6 (1963). In *Sherbert*, the Court indicated that government action having "a tendency to inhibit constitutionally protected activity," such as religious exercise, could constitute a substantial burden. 374 U.S. at 404 n. 6. The *Sherbert* Court found that a substantial burden on religious exercise would exist if one was forced to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work on the other hand." *Id*. at 404. On different occasions, the Supreme Court has stated that "substantial pressure on an adherent to modify his behavior and to violate his beliefs" or a government policy that tends "to coerce individuals into acting contrary to their religious beliefs" constitutes a substantial burden on one's religious exercise. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)*; Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987); *Thomas v. Review Bd of Ind. of Employment Sec. Div.,* 450 U.S. 707, 717-18 (1981). The First Circuit has adopted a comparable definition, stating that "[a]lthough we have not yet defined the term 'substantial burden,' we accepted, in *Spratt v. Rhode Island Dept. of Corrections*, 482 F.3d 33 (1st Cir.2007), the definition used by the district court in that case - *i.e.*, such a burden is one that puts

'substantial pressure on an adherent to modify his behavior and to violate his beliefs.' *Id*. at 38 (internal quotation marks and citation omitted)." *LeBaron v. Spencer*, 527 F. App'x 25, 29 (1st Cir. 2013) (per curiam).

If a plaintiff successfully establishes that a substantial burden has been placed on his religious exercise, the burden then shifts to the government to demonstrate that there was a compelling interest to burden that religious exercise and that it was achieved using the least restrictive means. 42 U.S.C. § 2000cc-1(a). Prison security and prison safety have been recognized as compelling government interests in situations involving prisoners' rights. *See, e.g., Cutter*, 544 U.S. at 725 n. 13; *Spratt,* 482 F.3d 33 at 39. It is important to bear in mind

> As the Supreme Court recently explained, "'[c]ontext matters' in the application of that standard." *Cutter*, 544 U.S. at 723, 125 S.Ct. 2113 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003)). Courts should apply the 'compelling governmental interest' standard with "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id.* (quoting S.Rep. No. 103-111, at 10 (1993) 1993 U.S.C.C.A.N. 1892, 1899). RLUIPA, in other words, is not meant to elevate accommodation of religious observances over the institutional need to maintain good order, security, and discipline or to control costs. *See Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir. 2006).

*Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007); *see also Hudson v. Dennehy*, 538 F. Supp. 2d 400, 409 (D. Mass. 2008), *aff'd sub nom. Crawford v. Clarke*, 578 F.3d 39 (1st Cir. 2009). The "least restrictive means" standard is more demanding. *Burwell v. Hobby Lobby Stores, Inc.*, -U.S.-, 134 S.Ct. 2751, 2780 (2014). The Supreme Court has defined this standard as requiring the government to demonstrate that "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases."

*Id.*

### V. Discussion.[7]

    A.    Request for Order for Group Observance of NGE Holy/Honor Days, Civilization Classes, Rallies, and Parliaments.

Plaintiff argues that he is prohibited from celebrating NGE's four Holy/Honor Days or participating in other corporate or group worship. It is obligatory that NGE adherents attend Civilization Classes, which are weekly study meetings between members, Rallies, which are held on the third Sunday of each month for members to discuss their lessons, and Parliaments, which are held on the fourth Sunday of each month for members to educate each other on their lessons. (#25-1 ¶¶ 11-13.) Plaintiff claims Defendants do not allow him to attend these mandatory Civilization Clases, Rallies or Parliaments. (#25-1 ¶ 14.) Defendants counter that this argument is moot, as the Handbook has recognized the right of NGE members to make such observances since May 2008. (#35-1 ¶ 7; #35-3, DOC Handbook at 71.)

"The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed.'" *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003) (quoting *Steffel v. Thompson*, 415 U.S. 452, 460 n. 10 (1974)). A case can be considered moot "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Exp Ass'n*, 393 U.S. 199, 203 (1968).

Plaintiff's claim regarding the observance of NGE Holy/Honor Days is moot. The Handbook specifically provides that NGE adherents be allowed to observe the four Holy/Honor

---

[7] The sincerity of Plaintiff's beliefs have not been challenged. Similarly, there is no dispute that the activities about which Plaintiff complains involve the "exercise of religion" within the meaning of RLUIPA.

days in group (corporate) worship in the presence of an NGE volunteer. In his affidavit, Mr. Mitchell states:

> With regard to corporate worship, '[I]f requested, inmates who identify themselves as NGE adherents should be allowed to corporately celebrate the four holy days mentioned above (#1) with the presence of an external approved NGE permanent volunteer. Also, one-on-one meetings between inmate adherents and external approved NGE volunteers in accordance with 103 CMR 471.10 will be allowed if consistent with institutional safety and security requirements.' See NGE section of Handbook - 2015.

#35-1 ¶ 19. This addition to the Handbook approximately seven and a half years ago makes clear that this claim is moot because the "wrongful behavior could not reasonably be expected to recur." *Concentrated Phosphate*, 393 U.S. at 203.

Plaintiff is permitted "to pray/acknowledge God individually throughout the day" (#35-1 ¶ 18), "worship, study and pray in his cell" (#35-1 ¶ 33), and "seek spiritual counseling and guidance from Minister Randy" (#35-1 ¶ 36), the Nation of Islam Chaplain at MCI-Norfolk.[8] However, Plaintiff argues that he is yet unable to engage in Civilization Classes, Rallies, and Parliaments, insofar as he and other NGE adherents cannot participate in such activities without the supervision of an approved NGE volunteer.[9] Several Courts of Appeals have concluded "that the requirement of an outside volunteer did not place a substantial burden on the plaintiff's religious exercise under RLUIPA," *Baranowski*, 486 F.3d at 125 (citation omitted), which ends the inquiry.

---

[8] As noted, NGE arose from the Nation of Islam. Moreover, "DOC Chaplains are required, by policy, to assist inmates in their individual spiritual journey even if the inmate's particularized understanding of his own faith does not completely comport with the theology as understood by the [] DOC Chaplain." (#35-1 ¶ 36.)

[9] With respect to this claim, Plaintiff states that he "is not requesting that the Defendants find a NGE volunteer, nor is Plaintiff requesting 'unsupervised' meetings.' (#36 at 4.)

*See also Kramer v. Pollard*, 497 Fed. Appx. 639, 643-44 (7th Cir. 2012); *Spies v. Voinovich*, 173 F.3d 398, 405-06 (6th Cir. 1999).

Even assuming that the DOC's policy allowing corporate worship only in the presence of a DOC chaplain or minister or a DOC-approved volunteer does place a substantial burden on Plaintiff's religious practice, Defendants contend that this is in keeping with an overarching policy that prohibits inmates from preaching or engaging in corporate worship absent supervision, motivated by concerns about safety and security. (#35-1 ¶¶ 9-10.) According to Plaintiff, this policy is not applied to each religious group in a consistent manner.

Plaintiff has presented evidence in support of his position. (*See* # 25-1 ¶¶ 10-15; #36, Ex.1, Affidavit of Daniel LaPlante ¶¶ 2-3; #36, Ex. 2, Second Affidavit of Cynthia Sumner ¶¶ 4-7.) During prior litigation between one Daniel LaPlante, an inmate at MCI-Norfolk and a practicing Wiccan, and the DOC, Cynthia Sumner submitted an affidavit. Serving as the Deputy Superintendent for Classification and Treatment at MCI-Norfolk, Sumner discussed MCI-Norfolk's Community Services Division ("CSD") building, which is used for inmate activities including religious services. (#36-2 ¶¶ 5-6.) She noted that "there are two correction officers [generally] assigned to the CSD building who conduct periodic security rounds when it is open" and that "numerous inmate groups . . . meet every day in the CSD building." (#36-2 ¶¶ 6-7.) LaPlante, too, has filed an affidavit wherein he stated:

> 2) I worked in the CSD building, for several years, as the Committee Coordinator, and I am familiar with the running of the building, as well as the scheduling of groups, as that was part of my functions as Committee Coordinator. Groups often have meetings without volunteers, including religious groups. These groups are supervised by periodic rounds of the two correctional officers assigned to the CSD building. With regard to specific religious groups, sixteen (16) readily come to mind:
>     a. Buddhist: CSD Battleroom; 1:00 PM; Mondays

      b. Catholic Work Group CSD Catholic Office; 1:00 PM; Mondays
      c. Jews: CSD Synagogue; five days a week, when the Rabbi in (sic) not here
      d. Muslims: CSD Masjid; when the Iman is not here
      e. Jehovah's Witnesses: CSD Battleroom; 6:00 PM; Mondays
      f. Asian Catholic Bible Study: CSD Catholic Office; 6:00 PM; Mondays
      g. Rastafarian: CSD Chapel; 1:00 PM; Tuesdays
      h. Native American: CSD Battleroom; 1:00 PM; Tuesdays
      i. Protestant Bible Study: CSD Protestant Office; 1:00 PM; Tuesdays
      j. Refuge Church Bible Study: CSD Chapel; 1:00 PM; Wednesdays
      k. Dominican Laity Group: CSD Catholic Office; 6:00 PM; Wednesdays
      l. Cursillo Group: CSD Council Room; 6:00 PM; Fridays
      m. Wiccans: CSD Battleroom; 6:00 PM; Sundays
      n. Catholic Choir: CSD Chapel; 6:00 PM; Sundays
      o. Protestant Prayer Group: CSD Battleroom; 6:00 PM; Tuesdays
      p. Catholic Video: CSD Catholic Office; 1:00 PM; Wednesdays
      q. Protestant Spanish Choir: CSD Foyer; 1:00 PM; Fridays

3) The Wicca group at MCI-Norfolk does not have a volunteer, and is supervised by periodic security rounds conducted by the two (2) correctional officers assign (sic) to the CSD building.

(#36, Affidavit of Daniel LaPlante).

Assuming, *arguendo*, that these inmate groups meet with only the supervision of two correctional officers, the DOC has articulated a specific security-related justification that distinguishes NGE from the other groups. When adding NGE to the Handbook, after reading the NGE texts and consulting with Mr. Palmer as well as DOC's Central Intelligence Unit, the RSRC determined that "[t]here were security concerns about the contents of some written NGE materials that espouse violence/killing. Our concern as a Committee was that inmates, processing this material by themselves, out of context, might be incited to violence against other inmates and staff." (#35-1 ¶ 10.) It was because of that concern that restrictions were placed on NGE's written materials, limiting them to use only by an adherent in his cell. *Id.* This same concern supports the limitations on corporate worship, i.e., that it must be conducted "with the presence of an external approved NGE permanent volunteer." (#35-3 at 11.)

15

Defendants have demonstrated that the DOC has a compelling interest, namely, prison security and the avoidance of violence, in burdening Plaintiff's religious exercise. Deference is due to the DOC's expertise in the area of prison safety. *Hudson*, 538 F. Supp.2d at 409. By requiring the presence of an NGE volunteer when conducting corporate worship so as to aid adherents in properly interpreting NGE texts and tenets in order to avoid inciting violence, Defendants have tailored the least restrictive means of furthering that interest. *Id.* at 410. The option of allowing NGE adherents to meet solely under the supervision of two correctional officers simply would not address the DOC's specific security concerns.

      B.      Request for Order for Dedicated Area for Group Worship.

At present, NGE members can only engage in corporate worship in the presence of an NGE volunteer and do not have their own designated space for worship. Plaintiff argues that the lack of a dedicated worship space imposes a substantial burden that implicates his freedom to practice his faith and so violates his rights under the RLUIPA. This contention is not persuasive. Limiting an inmate's ability to practice religion, but still allowing the practice, does not constitute a substantial burden. *See Lyng*, 485 U.S. at 447-53; *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972) ("We do not suggest, of course, that every religious sect or group within a prison - however few in number - must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."); *Hudson*, 538 F. Supp.2d at 409-10.  The lack of a specifically designated space for worship for NGE adherents in no way tends "to coerce individuals into acting contrary to their religious beliefs," *Hudson,* 538 F. Supp.2d at 409-10, and is not a substantial

burden on Plaintiff's exercise of his religion.

  C.  Request for Order to Allow NGE Practitioners to Proselytize.

The parties agree that Plaintiff is not allowed to proselytize, or engage in individual conversations about cultural tenets, with other inmates. Mr. Mitchell states in his affidavit:

> The MA DOC does not permit inmates to proselytize. In MA DOC custody, we have Jehovah's Witnesses and one of the central tenets of this faith group is proselytizing. Nonetheless, Jehovah's Witness inmates cannot preach or teach their faith to others. The MA DOC has a prison policy which prohibits inmate preaching; it has a policy entitled Inmate Management, 103 DOC at 400.06, entitled No Inmates Control Over Other Inmate(s), which states: 'No inmate or group of inmates shall be in a position of authority over any other incarcerated person(s).' This serves the Department's compelling security need to supervise 10,500 inmates in its 17 prison facilities.

(#35-1 ¶ 46.) A fundamental goal of the DOC's inmate management policy is to keep inmates from being in positions of authority or control over other inmates, a driving motivation in the ban on proselytizing. (#35-1 ¶ 46.) Plaintiff contends that this policy substantially burdens his ability to practice NGE because proselytizing is required as part of his faith. (#25-1 ¶¶ 4, 8.)

Plaintiff argues that this case is governed by the First Circuit's decision in *Spratt v. Rhode Island Dept. Of Corrections*, 482 F.3d 33 (1st Cir. 2007). Spratt was an inmate (and ordained minister) who had been preaching at weekly services at the Adult Correctional Institute in Rhode Island for a seven-year period when he was told that he was prohibited from doing under prison regulations. *Id*. at 35. The court determined that the defendant Rhode Island Department of Corrections's blanket prohibition on preaching substantially burdened plaintiff Spratt's religious exercise. *Id.* at 38. With the burden then shifting to the defendant, the First Circuit concluded that there were "inconsistencies between RIDOC's various explanations for its policy [which] require[d] further explanation" and, "[e]ven if we assume that RIDOC has shown a link between Spratt's

preaching and institutional security, RIDOC still has not shown that the blanket ban on all inmate preaching is the 'least restrictive means' available to achieve its interest." *Id.* at 40-41. The court reversed the entry of summary judgment for the defendant and remanded for further proceedings. *Id* at 43.

While the *Spratt* decision certainly addresses the issue of inmates' preaching, it is not dispositive on the facts of this case as it applies to Plaintiff. Plaintiff has established that his religious exercise has been substantially burdened. However, as discussed earlier, the DOC has articulated a distinct compelling government interest that supports the preaching ban with respect to NGE adherents. The DOC views NGE's central texts as having the potential to create security threats if not properly interpreted, and therefore requires that NGE adherents' practice be under the supervision of an approved volunteer or done individually. (#35-1 ¶ 10.) This conclusion was reached after a thorough review of NGE's texts and tenets as well as consultation with the nationwide Prison Administrator for NGE and prison security experts. The potential for violence and security threats certainly would carry over to NGE adherents proselytizing to non-believers. After consideration, the DOC found no less restrictive way to address the particular security issues raised by the NGE religious materials.

D. Request for Order Barring NGE Practitioners from Being Labeled a Security Threat Group.

NGE's label as a Security Threat Group was removed from the DOC's Religious Services Handbook in 2011, rendering this issue is moot. (#35-1 ¶ 13.)

E. Request for Order to Permit NGE Adherents to Invite Unrecognized Members of NGE to Attend Any of the Four Cultural Observances.

Plaintiff seeks for NGE practitioners to be allowed to invite other inmates to attend the four annual NGE cultural observances. According to Mr. Mitchell, inmates may audit faiths in which

they may have an interest. (#35-1 ¶ 45.)  Auditing a faith enables an inmate to attend some corporate worship services. *Id.* "However, the inmate who is auditing the faith may not participate during Holy days or Religious Feast days where it would diminish the spiritual experience for those inmates who are devout and share a commonality of belief in the faith." *Id.* (emphasis in original)

Plaintiff has failed to establish that the DOC's policy not to allow NGE members to invite other inmates to attend NGE's four annual cultural observances creates a substantial burden on his religious exercise.  Courts have long recognized a need to defer to the judgment and expertise of prison administrators in making such decisions. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). A prisoner's right to practice religion is not absolute. *Hudson,* 538 F. Supp.2d at 409-10 (holding that government programs "'which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs,' are not affected by this standard"). The DOC's policy refusing to allow inmates to invite other inmates to participate in their Holy days or Religious Feast days services does not constitute a substantial burden as that term has been interpreted; there is no "tendency to coerce."  Whatever impact the DOC's policy may have on inmates seeking to audit NGE, it does not implicate *Plaintiff's* ability to practice his religion or participate in NGE's four cultural observances throughout the year.

## VI. Conclusion and Order.

For the reasons stated, it is ORDERED that the Motion for Summary Judgment (#25) and Plaintiff's Supplemental Motion For Summary Judgment (#36) be, and the same hereby are, DENIED.  It is FURTHER ORDERED that Defendants' Opposition to and Cross-Motion for Summary Judgment (#30) be, and the same hereby are, ALLOWED. Judgment shall enter in favor of Defendants.

|  | /s/ M. Page Kelley |
|---|---|
|  | M. Page Kelley |
| February 5, 2016 | United States Magistrate Judge |